1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11  JEREMY ALLEN WESSELS,

12                              Petitioner,

13               vs.

14

15  BARNES B. GOWER,

16                              Respondent.

17

Civil No.        13cv0819 GPC (RBB)

**ORDER:**

**(1)  DENYING PETITION FOR WRIT OF HABEAS CORPUS; and**

**(2) GRANTING CERTIFICATE OF APPEALABILITY AS TO CLAIM TWO**

18  **I.      INTRODUCTION**

19          Petitioner Jeremy Allen Wessels, a state prisoner proceeding pro se and in forma

20  pauperis with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254,

21  challenges his conviction in San Diego County Superior Court Case No. SCE284009

22  for first degree murder [ECF No. 1].[1]

23          The Court has reviewed the pertinent portions of the record and has considered

24  the legal arguments presented by both parties.  For the reasons discussed below, the

25  / / /

26  / / /

27

28

---

[1] Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the Court's electronic case filing system.

1  Petition is **DENIED**.  The Court **GRANTS** a certificate of appealability as to claim two

2  in the petition.[2]

3  ## II.    FACTUAL BACKGROUND

4         This Court gives deference to state court findings of fact and presumes them to

5  be correct; Petitioner may rebut the presumption of correctness, but only by clear and

6  convincing evidence.  *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parle v.*

7  *Fraley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including

8  inferences properly drawn from these facts, are entitled to statutory presumption of

9  correctness).  The following facts are taken from the California Court of Appeal

10  opinion:

11         *Murder and 1994 Investigation*

12         On September 16, 1994, a fire captain responded to David Binno's
    apartment at approximately 10:00 p.m.  The apartment door was slightly
13  askew, lights inside the apartment were turned off, and very loud music
    was playing inside.  Binno was lying on the floor in a large pool of blood,
14  and his brain tissue was visible; therefore the fire captain concluded
    Binno was deceased.

15
16         There was no evidence of a break-in at Binno's apartment.
    Detectives recovered from the scene two spent casing that came from the
    same gun.  The results of DNA and fingerprint tests at Binno's apartment
17  did not match either Wessels or Franswa Shammam, Wessels's friend.
    Detectives found no evidence of blood in or on Shammam's pickup truck.

18
19         Haitham Marcos testified Binno had helped him repair Marcos's car
    until approximately 3:45 p.m. that day, when Binno had to go home to
20  take care of a phone bill payment from Wessels.  The parties stipulated the
    distance between Marcos's residence and Binno's residence was 4.1 miles
    by the most direct route; it would take approximately nine minutes to
21  drive between the two residences directly, barring some unusual event
    such as an accident or construction.

22
23         Kristin Lybarger lived in Binno's apartment complex, and testified
    that she came home from work at around 4:00 p.m. that day.  Binno's car
24  was not in its parking stall, but instead a black pickup truck was parked
    there.  However, at approximately 4:40 p.m., she saw Binno's car in its
25  usual parking stall, and the black pickup truck was parked next to
    Binno's.

26
   _____
       [2]   Although this case was randomly referred to United States Magistrate Judge Ruben B.
27  Brooks pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and
    Recommendation nor oral argument is necessary for the disposition of this matter. *See* S.D. Cal. Civ.
28  L. R. 71.1(d).

Kara Walter, who lived in an apartment just below Binno's, told detectives that between 4:25 p.m. and 4:30 p.m. that day, she heard about two or three people talking as they climbed the stairs to Binno's apartment. A few minutes later, the music in Binno's apartment was turned up excessively loud. As Walter was leaving home at approximately 4:30 that afternoon, she heard two "pops" that sounded like firecrackers come from Binno's apartment. She heard voices talking immediately afterwards. When Walter returned home at approximately 8:30 that night, the lights in Binno's apartment were turned off, and the music was still very loud. She called and complained to the apartment manager.

Detectives interviewed Wessels approximately three days after Binno's murder. He admitted that twice on the afternoon of the murder he went to Binno's apartment to pay his phone bill. Wessels claimed that at about 2:00 p.m., Binno's car was not parked in its usual stall; however, the second time, which was before 5:00 p.m., Binno's car was there. But Binno did not respond to Wessels's knocks on the apartment door either time.

Detectives repeatedly asked whether Shammam had accompanied him to Binno's apartment that afternoon, but Wessels was evasive: "I don't, I don't, want to talk about [Shammam], I don't, I don't talk to [Shammam], I don't, I don't, I don't even want to talk about [sic]. It has nothing to do with me and [Binno]. [Shammam] has nothing to do with me and [Binno]. I have, I have no idea." Wessels later responded to the same question by stating, "No, okay, well I don't know, I couldn't tell you, like I say, I couldn't say, I could not say yes, I couldn't say no I don't, you know I don't even know that."

*Monica Bihouet's 1996 Interview with Detectives*

Monica Bihouet Cervantes testified that she and Shammam had been dating since approximately 1991. A few days before September 16, 1994, Bihouet, Shammam and Wessels were together, and Shammam jokingly said they should kill Binno. In 1996, almost two years after Binno's death, Bihouet told detectives that Wessels and Shammam had joked about killing Binno, and Wessels had said that if Binno's girlfriend were there, she too would be killed. Bihouet also reported to police that around middle or late afternoon on the day of the murder, Shammam and Wessels, who both appeared recently showered, arrived at her house. Shammam told her they had just killed Binno. Shammam asked Bihouet to keep a bag that contained Binno's gold bracelet and necklace. Days later, at Shammam's request, Bihouet took the jewelry to Tijuana, Mexico, and had it melted. On September 27, 1994, Bihouet pawned the gold at a shop in San Ysidro, California.

Shortly after the killing, Shammam explained the circumstances surrounding it to Bihouet. Shammam said Binno had owed Wessels money, and Binno talked too much. Shammam and Wessels went to Binno's apartment, and first wrestled and joked around; later, Wessels grabbed Binno, and Shammam used Wessels's gun to shoot Binno twice in the head. They turned up the music loud so the gunshots would not be heard. Shammam said he had thrown away the gun afterwards.

When Bihouet spoke to detectives in 1996, she had recently ended her relationship with Shammam. She claimed she had not spoken to detectives about Shammam's involvement in the murder earlier because she was afraid he might kill her too. Shammam had once fired a gun in her presence because she had told him she wanted to break up with him.

At trial, during Bihouet's cross-examination, defense counsel asked if she had reported to police that Shammam "was dealing suitcases of cocaine." The prosecutor objected on relevance grounds. The defense attorney countered, "It's not being offered for the truth of the matter. It's offered to show bias. When a person goes down to the police and starts making lots of allegations that are unfounded, that goes to the person's credibility and bias." The court sustained the objection, finding the statement was prejudicial: "I just see all kinds of problems under [Evidence Code section] 352. It's involving a co-defendant . . . [T]here really is no effective way to cross-examine [Bihouet] on that question once it's out there before the jury." The court later confirmed its ruling and stated, "I find it's irrelevant, and it's also offered for the truth of the matter, that, in fact, he was in possession of suitcases of cocaine, and it doesn't deal with her credibility."

### Other Evidence of Murder

Deputy medical examiner Mark Super performed an autopsy on Binno's body and concluded the cause of death was two gunshot wounds to the head, and the manner of death was homicide. Binno had no defensive wounds on his body.

Brian Kennedy, a crime scene reconstructionist, testified that Binno was on or just above the floor at the time he was shot both times. Further, based on the placement of Binno's left hand extending beyond his right side, it seemed likely that someone restrained Binno's hand and was pulling it across, thereby holding him down on the floor. Binno's body was not repositioned after he was shot.

### Defense Case

William Chisum, a crime scene reconstructionist, disagreed with the People's expert's theory that someone had restrained Binno while another person shot him. Rather, Chisum testified someone rolled Binno's body onto his right side. Chisum also concluded Binno was on his knees when he was shot execution style.

Charles Merrit Jr., a criminalist employed by the San Diego County Sheriff's Department Regional Crime Laboratory, testified he agreed with Chisum's conclusion that no evidence showed how the victim got to the position when he was shot, and that he could not tell whether Binno was restrained prior to being shot.

(Lodgment No. 5 at 2-7.)

/ / /

/ / /

### III.   PROCEDURAL BACKGROUND

On December 24, 2008, the San Diego County District Attorney's Office filed an amended information (information) charging Jeremy Allen Wessels with one count of murder, a violation of California Penal Code (Penal Code) section 187.  (*See* Lodgment No. 1, vol. 1 at 0041-42.)  The information also alleged Petitioner was armed with a firearm during the commission of the offense, within the meaning of Penal Code section 12022(a)(1).  (*Id.*)  Wessels was tried by a jury, which failed to reach a verdict, and a mistrial was declared.  (*See* Lodgment No. 1, vol. 6 at 1444.)

A second trial began on April 22, 2010.  (*See* Lodgment No. 9, vol. 1.)  Wessels was convicted of first degree murder on May 6, 2010.  (Lodgment No. 1, vol. 5 at 1380.)  The jury also found true the gun allegation.  (*Id.*)  Wessels was sentenced to twenty-five years-to-life for the murder, plus one year for the firearm allegation. (Lodgment No. 1, vol. 6 at 1408-09; Lodgment No. 9, vol. 12 at 1165.)

Wessels appealed his conviction to the California Court of Appeal for the Fourth Appellate District, Division One.  (Lodgment Nos. 2-4.)  The state appellate court upheld his conviction but directed the trial court to modify the abstract of judgment to reflect the proper custody credits.  (Lodgment Nos. 5-6.)  Wessels then filed a petition for review in the California Supreme Court.  (Lodgment No. 7.)  The California Supreme Court denied the petition without citation of authority.  (Lodgment No. 8.)

On April 4, 2013, Wessels filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court.  (ECF No. 1.)  Respondent filed and Answer and Memorandum in Support of the Answer on June 10, 2013.  (ECF No. 9.)  Wessels filed a Traverse on June 24, 2013.  (ECF No. 11.)

### IV.   DISCUSSION

Wessels raises three claims in his Petition.  First, he contends the exclusion of defense witness James Smith violated his federal constitutional right to present a defense.  (Pet. at 6-17, ECF No. 1; Traverse at 5, ECF No. 11.)  Second, he argues the fourteen-year delay in filing the charges against him violated his federal constitutional

1  rights to due process.  (Pet. at 18-25, ECF No. 1; Traverse at 2-4, ECF No. 11.)  Third,

2  he claims that evidence relating to the testimony of Monica Bihouet was improperly

3  excluded, violating his federal constitutional rights.  (Pet. at 26-35, ECF No. 1;

4  Traverse at 6-8, ECF No. 11.)

5  　　　　Respondent addresses Wessels claims out of order for ease of reference.  As to

6  Wessels's first claim, that the delay in charging him violated his due process rights,

7  Respondent argues the state court's adjudication was neither contrary to, nor an

8  unreasonable application of, clearly established Supreme Court law.  Respondent

9  argues claims one and three, regarding admission of evidence at Wessels's trial, do not

10 state a federal question, and, in any event, the state court's denial of those claims was

11 neither contrary to, nor an unreasonable application of, clearly established Supreme

12 Court law.  (Mem. of P. & A. Supp. Answer at 5-38, ECF No. 9.)  In the interest of

13 simplicity, the Court will address Wessels's claims in the order presented by

14 Respondent.

15 　　　　A.  *Standard of Review*

16 　　　　This Petition is governed by the provisions of the Antiterrorism and Effective

17 Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).

18 Under AEDPA, a habeas petition will not be granted with respect to any claim

19 adjudicated on the merits by the state court unless that adjudication: (1) resulted in a

20 decision that was contrary to, or involved an unreasonable application of clearly

21 established federal law; or (2) resulted in a decision that was based on an unreasonable

22 determination of the facts in light of the evidence presented at the state court

23 proceeding.  28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).  In deciding

24 a state prisoner's habeas petition, a federal court is not called upon to decide whether

25 it agrees with the state court's determination; rather, the court applies an extraordinarily

26 deferential review, inquiring only whether the state court's decision was objectively

27 unreasonable.  *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*,

28 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.* Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

/ / /

B.  *Pre-Complaint Delay (Claim Two)*

Binno was murdered in 1994, but charges were not brought against Wessels and his co-defendant, Franswa Shammam, until 2008.  Although police suspected Wessels and Shammam were involved in Binno's murder in 1994, it was not until Bihouet came forward with her information in 1996 that any evidence linked Wessels to the crime. Law enforcement delayed another twelve years before charging Wessels and Shammam with Binno's murder.  This delay was the subject of lengthy pre- and post-trial motions and hearings.  (*See* Lodgment No. 1, vol. 3 at 568 - vol. 5 at 1259; Lodgment No. 10, vol. 2-3.)  The state court ultimately concluded that Wessels had suffered some prejudice as a result of the delay, but concluded that, on balance, the delay was justified.  (Lodgment No. 1, vol. 6 at 1398-1404.)  In a comprehensive review of that decision, the state appellate court upheld the trial judge's decision, reasoning as follows:

> *Motion Regarding Preaccusation Delay*
>
> In his moving papers supporting the pretrial motion to dismiss because of preaccusation delay, Wessels argued he had been prejudiced because detectives had written notes indicating they had held a meeting with Bihouet in October 1996, but neither Bihouet nor the detectives could remember whether that meeting took place or what was discussed. Additionally, in the first trial, other witnesses, including Walter, Smith, Marcos, Binno's sister and other detectives had testified they had forgotten certain details regarding Binno's murder.  Further, detectives had not followed up on leads pointing to Binno's involvement in drug sales possibly in association with the Mexican mafia.  Wessels argued detectives did not investigate Sal Asker — a possible third-party exculpatory witness — and his girlfriend, Leanna, who possibly knew how Binno was murdered.  The defense lacked further information because Asker was murdered in 1997, and Leanna could not be located. Wessels concluded, "[T]he charges against [him] could have been filed in 1996.  No new evidence prompted the filing of charges in 2008.  Law enforcement sat on the case for 12 years."
>
> During postverdict motion arguments, the parties stipulated the court could rely on the transcript of evidentiary hearings that Judge John Thompson conducted in the case of Shammam, who was tried separately. (*People v. Shammam* (Super. Ct. S.D. County, 2010, No. SCE 286668).) In hearings regarding the preaccusation delay in the Shammam case, defense counsel asked Detective Rowe, "Assuming that David Binno was alive between 7:15 [p.m.] to 7:30 [p.m.], isn't it correct that there's no evidence that connects Franswa Shammam to that killing that occurred after 7:15 [p.m.] or 7:30 [p.m.]?"  Detective Rowe replied, "correct."

Defense counsel continued, "So that would mean [Shammam] didn't do it, is that right, if [Binno] was killed at 7:30 [p.m.]? As a practical matter, it would mean that Franswa Shammam didn't kill him?" Detective Rowe replied, "I don't know Mr. Shammam's whereabouts at that time frame, that's why it's difficult for me to answer that question."

The People opposed the motion to dismiss and countered Wessels's arguments by pointing out that even if Bihouet had met with detectives a second time in 1996, her trial testimony and her statements in her first interview with detectives were consistent regarding the material question in this case: Shammam and Wessels had killed Binno. The People argued the witnesses whose memories had faded could be impeached with their statements that were memorialized in recordings or written reports earlier in the investigation. Regarding third party culpability, the People argued, "[Wessels] has provided no 'lead' that would result in any evidence placing [his guilt] into doubt. He has presented no evidence directly or circumstantially linking the leads to the crime. He has, at best, provided leads that are based on innuendo and rumor. None of this meets the admissibility standards for third party culpability as set forth in [*People v. Hall* (1986) 41 Cal.3d 826, 833]." Sal Asker was in custody when Binno was killed.

The People argued the preaccusation delay was justified because from the murder until the accusation was filed, the investigation had been ongoing. Specifically, in 1994, detectives concluded Binno's death was a homicide, and Wessels and Shammam were suspects. Thereafter, the investigation went cold until 1996, when Bihouet tipped the investigators about Shammam's and Wessels's specific statements about their involvement in the killing. However, Bihouet's credibility was in doubt because she was considered a possible accessory after the fact. In 2000, Detective Serritella reopened the case and re-interviewed witnesses, but obtained no new evidence; therefore, the deputy district attorney decided more investigation was needed. In 2005, Binno's family insisted on reopening the investigation, and detectives pursued new leads, re-interviewed some individuals, and discussed the case with another deputy district attorney. But again, no new evidence was discovered. In 2007, Detective Scully reviewed the case, re-interviewed witnesses and in 2008 obtained a statement by David Abdala, who contradicted defendants' alibi that they were with him the night of the murder. Shortly after obtaining Abdala's statement, the People filed charges. In sum, the People argued, "Although the case was initially not brought to the District Attorney's Office, and then only informally presented, the investigation never ended. The hope was that new evidence would be discovered to strengthen the case against the two suspects. Witnesses were interviewed and re-interviewed several times. The evidence was reviewed a number of times."

The trial court ruled that although Wessels had demonstrated prejudice because of the witnesses' faded memories, the preaccusation delay was justified by the need to conduct the investigation, and the delay outweighed any prejudice to Wessels. Specifically, the trial court ruled: "Defendant Wessels has made a showing that he suffered some prejudice due to the prosecution's delay in filing the felony complaint. There was sufficient evidence presented during the trial to establish that memories of both civilian and law enforcement witnesses faded due to the lapse of

time. [¶] Specifically, the defense contends that dismissal is warranted based on the inability to effectively cross-examine the victim's neighbor, Mr. Smith, and the fact the police did not fully investigate his statements at the time of the murder." The court clarified, "The statement provided by Mr. Smith to the police was no[t] necessarily exculpatory for the defense. Mr. Smith told the police that he heard argument between a man and a woman around 7:00 p.m. However, there is no evidence that the man Mr. Smith heard arguing was Mr. Binno or that it could have been established to have been Mr. Binno if further investigated at the time Mr. Smith made the statement. Mr. Smith's statement that he thought it was Mr. Binno is speculative."

The court excluded the possibility the preaccusation delay affected the establishment of third party culpability, noting, "[N]o evidence has been presented that third-party culpability was a viable defense in the present case. Further, the defense has not shown that there has been a loss of physical evidence due to the delay."

The court further found the People had acted in good faith in conducting the investigation: "[T]he investigation into Mr. Binno's murder did continue during [the] 14–year delay between the murder in 1994 and the filing of the felony complaint in 2008. The amount of time spent on the investigation varied during the years, but that does not establish that the police had determined the investigation into this case had concluded and there was no additional work to be performed. The case was transferred between detectives due to change in assignments. The evidence shows that each detective did work on the investigation and attempted to obtain enough evidence for a criminal prosecution. The case was presented to members of the District Attorney's office in order to determine if the case was ready for prosecution or what other avenues of investigation should be undertaken. The decision to delay the filing of the complaint was made after a good faith evaluation of the evidence by law enforcement personnel and the District Attorney's office."

The court further ruled: "In balancing the prejudice [Wessels] demonstrated during the trial and at the motion hearings against the People's justification for the delay, this court finds that [Wessels's] due process rights have not been violated. The purpose of the delay was not to gain a tactical advantage over [Wessels]. The delay was the result of the prosecution exercising its discretion to delay filing of the charges for investigative purposes. When weighing the prejudice against the People's justification for the delay and then taking into consideration the seriousness of the crime and the public's interest in favor of this type of prosecution, the court finds that no due process violation has been shown."

## DISCUSSION
### I.

Wessels contends the preaccusation delay prejudiced him because (1) James Smith's exculpatory testimony that he had heard voices coming from the direction of Binno's apartment at approximately 7:15 p.m. "would have directly supported a not guilty verdict"; (2) he was unable to cross-examine Bihouet regarding inconsistent statements she had made to Detective Rowe; (3) "there was a substantial amount of potential third[-party] culpability evidence that indicated that someone else besides

[himself] and Shammam" might have killed Binno, but the police did not pursue those leads; (4) due to the passage of time, many witnesses' memories had faded; (5) the delay was used to the prosecution's tactical advantage and was inexcusable because all witnesses were known to police as of 1996; and (6) even assuming the delay was justified, the prejudice to him outweighed the People's justification.

The California Supreme Court states, "Delay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions.  A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay.  The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay. [Citations.] A claim based upon the federal Constitution also requires a showing that the delay was undertaken to gain a tactical advantage over the defendant." (*People v. Catlin* (2001) 26 Cal.4th 81, 107, 109 (*Catlin*).)  "The statute of limitations is usually considered the primary guarantee against bringing overly stale criminal charges," and there "is no statute of limitations on murder." (*People v. Archerd* (1970) 3 Cal.3d 615, 639, abrogated on another ground in *People v. Nelson* (2008) 43 Cal.4th 1242, 1254 (*Nelson*).)

In *Nelson*, the California Supreme Court concluded that "under California law, negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process." (*Id.* at pp. 1254–1255.)  The court observed that "whether the delay was negligent or purposeful is relevant to the balancing process.  Purposeful delay to gain an advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation.  If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation." (*Id.* at p. 1256.)

Among other things, " '[p]rejudice [for due process or speedy trial violation claims] may be shown by loss of material witnesses due to lapse of time [citation] or loss of evidence because of fading memory attributable to the delay.' " (*Catlin*, *supra*, 26 Cal.4th at p. 107.)  The overarching theme is that the loss of such evidence, especially where the defendant or victims cannot independently recall details of the crime, makes it difficult or impossible for the defendant to prepare a defense, thus showing prejudice. (*See People v. Pellegrino* (1978) 86 Cal.App.3d 776, 780 (*Pellegrino*).)

In balancing the interests, "it is important to remember that prosecutors are under no obligation to file charges as soon as probable cause exists but before they are satisfied that guilt can be proved beyond a reasonable doubt or before the resources are reasonably available to mount an effective prosecution.  Any other rule 'would subordinate the goal of orderly expedition to that of mere speed.' " (*Boysen*, *supra*, 165 Cal.App.4th at p. 777.)  On the other hand, " '[t]he [prosecutors] cannot simply place gathered evidence of insubstantial crimes on the "back burner" hoping that it will some day simmer into something more prosecutable.' " (*Pellegrino*, *supra*, 86 Cal.App.3d at p. 781.)  Nor may "[t]he requirement of a legitimate reason for the prosecutorial delay . . .

be met simply by showing an absence of deliberate, purposeful or oppressive police conduct. A 'legitimate reason' logically requires something more than the absence of governmental bad faith. Negligence on the part of police officers in gathering evidence or in putting the case together for presentation to the district attorney, or incompetency on the part of the district attorney in evaluating a case for possible prosecution can hardly be considered a valid police purpose justifying a lengthy delay which results in the deprivation of a right to a fair trial." (*Penney v. Superior Court* (1972) 28 Cal.App.3d 941, 953.)

As we noted in *Boysen*, *supra*, 165 Cal.App.4th 761, "[t]he balancing task is a delicate one, 'a minimal showing of prejudice may require dismissal if the proffered justification for delay is insubstantial. [Likewise], the more reasonable the delay, the more prejudice the defense would have to show to require dismissal.' " (*Id.* at p. 777.)

Whether preaccusation delay is unreasonable and prejudicial to a defendant is a question of fact. (*People v. Dunn–Gonzalez* (1996) 47 Cal.App.4th 899, 911–912.) If the trial court concludes the delay denied the defendant due process or his constitutional speedy trial rights, the remedy is generally dismissal of the charge. (*Id.* at p. 912; *Boysen*, *supra*, 165 Cal.App.4th at p. 777.) "We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation], and defer to any underlying factual findings if substantial evidence supports them." (*People v. Cowan* (2010) 50 Cal.4th 401, 431.)

Wessels's showing of prejudice is "relatively weak." (*See Nelson*, *supra*, 43 Cal.4th at p. 1256.) He contends he was prejudiced because detectives failed to re-interview Smith regarding his claim he heard a voice, possibly Binno's, coming from Binno's apartment between approximately 7:15 p.m. and 7:30 p.m., and Smith's subsequent loss of memory regarding that earlier statement. But we conclude the trial court did not err in finding Smith's testimony was speculative at the time it was made in 1994. Smith did not claim to see Binno; he only claimed to hear Binno's voice. At any rate, Smith's testimony does not exclude the possibility that Wessels and Shammam killed Binno; therefore, even if the trial had occurred closer to 1994, it is not reasonably likely Smith's testimony would have been any more helpful to Wessels. Further, other testimony established that earlier in the afternoon, voices were heard at Binno's apartment, the sound of gunshot was heard, and the music was turned up afterwards. The music was still loud when Binno's neighbor returned home approximately four hours later.

Wessels asserts additional discovery he obtained after the first trial — specifically, Detective Rowe's handwritten notes — showed that after Bihouet's August 1996 meeting with detectives, she had another meeting with them in October 1996. [footnote 4: Detective Rowe's notes are sparse. They appear to be dated October 10, 1996, and state: "In our office with [detectives] Gordon Davis Rick Martin Jopes and Rowe. [¶] Wants to meet her at school. Does not want to talk on phone. [¶] They called her outside Yvette's house. [Wessels] and [Shammam] asked her to go outside. [¶] Did not tell about incident then. Just asked to hold something for him. Told the next day about the incident. [¶] A couple of days later said him and [Wessels] did that. [¶] When first told about the murder, was in the truck by themselves. He was nervous and sweet [sic].

[¶] 1145 attempt about one year ago.  At her Apartment.  [¶] turned gas on stove.  And closed all windows.  [¶] Just fed up with everything.  [¶] Rosco Pico (friend) — Brenda knows her [¶] 660 5089 [¶] w—595−1200 [¶] Universal Grocery on Anita St. in Otay.  [¶] Called her yesterday about 8 pm.”].  However, neither Bihouet nor Detective Rowe remembered whether that second meeting took place or what was discussed.  Nonetheless, Wessels asserts that one or more meetings took place between Detective Rowe and Bihouet, during which “[Bihouet] at best[, for] the prosecution[,] made inconsistent statements regarding Shammam and [Wessels’s] alleged admission to committing the shooting.  At worst[, for] the prosecution, [Bihouet] recanted her prior statements in their entirety and said she made everything up.”

Wessels’s assertion that a second meeting was held between Bihouet and detectives is speculative.  Detective Rowe’s scant notes do not conclusively establish that an October 1996 meeting took place, and no one recalled participating in any such meeting.  In any event, Bihouet’s 1996 statements to Detective Rowe — that she saw Shammam and Wessels the afternoon of Binno’s death; Shammam gave her Binno’s jewelry to hold; and, Shammam later told her how he and Wessels murdered Binno — were consistent with her trial testimony.  We conclude the preaccusation delay did not prejudice Wessels because there is no proof Bihouet had a second meeting in which she gave inconsistent statements from either her August 1996 interview or her trial testimony.

Wessels argued the unavailability of third party culpability witnesses prejudiced him.  In particular, early in the investigation, Binno’s sister and girlfriend had told Detective Rowe Binno was a drug dealer.  Specifically, Detective Rowe was told that three days before his murder, Binno had borrowed money from his mother, and he went to Las Vegas with two unknown Mexicans.  Binno’s sister told Detective Rowe that a friend had said a Mexican man had ordered a hit on Binno, but the friend refused to identify the person who ordered the hit.  One of Binno’s sisters also told Detective Rowe that a woman named Ophelia knew about Binno’s killing, but Ophelia refused to talk about it.  Ophelia had forbidden Binno’s sister from saying anything about Binno’s murder, warning that “[someone will] end up dead.”  Detective Rowe’s notes stated, “Ophelia is in Iowa and said to be involved in Latin Mafia.  She sent flowers to Binno at funeral.”

Wessels also points out that Detective Rowe’s 1994 notes indicate he interviewed a person who had learned that someone walked in and shot Binno in the head.  The names of Sal Asker and someone identified only as “Abdula” were written in the notes.  In 1996, Binno’s sister told Detective Rowe that they had heard that someone named Salwan Asker was involved with Binno’s murder and that Asker made his girlfriend, Leanna, hide a gun before Asker went to jail.

Based on the foregoing, Wessels contends: “Due to the passage of time, [he] was unable to effectively investigate and develop this third party culpability evidence fourteen years later.  As a result, he was precluded from introducing any third party culpability evidence in support of his defense.”

/ / /

The California Supreme Court held in *People v. Hall*, *supra*, 41 Cal.3d 826, 833: "To be admissible, . . . third-party [culpability] evidence need not show 'substantial proof of probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability . . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Accord*, *People v. Vines* (2011) 51 Cal.4th 830, 860; *People v. McWhorter* (2009) 47 Cal.4th 318, 367–368.) Further, third party culpability evidence is treated like any other evidence; it is admissible if relevant (Evid.Code, § 350) unless it is excludable pursuant to Evidence Code section 352. (*People v. McWhorter*, *supra*, 47 Cal.4th at pp. 367–368, 372–373; *People v. Hall*, *supra*, 41 Cal.3d at p. 834.)

As noted, the trial court summarily rejected third party culpability as a valid defense in this case. We conclude the trial court did not err in that assessment. Wessels's offer of proof failed to link either a member of a Mexican drug gang or Asker to the homicide. Further, Asker was in jail at the time of Binno's death. Any testimony regarding third-party culpability failed to raise a reasonable doubt regarding Wessels's guilt.

Wessels contends he suffered prejudice because he could not effectively cross-examine and confront several witnesses who had forgotten details regarding the events surrounding Binno's death. He points out that Detective Rowe, Walter, Marcos, and Binno's girlfriend at the time of death, Brenda Konja, had said several times during their testimony that they could not remember many things. For that reason, the trial court concluded Wessels "suffered some prejudice due to the prosecution's delay in filing the felony complaint" but clarified, "the defense in this case has not presented 'extensive evidence of prejudice." We note that the prejudice to Wessels was mitigated because Detective Rowe's notes were recorded and used to refresh his recollection in many instances. Further, Walter's statement at the time of the incident was admitted as a past recollection recorded. Finally, Marcos's memory regarding the timing and circumstances involving Binno's departure from Marcos's house was substantially intact. Any other testimony from Marcos indicating that his memory had faded did not relate to any significant point of dispute in the case, and therefore it was not overly prejudicial to Wessels.

Our inquiry turns to the People's justification for the delay, to balance whether it outweighed the prejudice. Wessels contends no justification existed for the delay because "[t]here was no DNA or other forensic evidence that eventually disclosed a suspect, there was no additional police investigation that produced a new witness, and there was no evidence presented at trial that was previously unavailable as of at least 1996. All of the prosecution's witnesses in this case were already known to the prosecution in 1994. The only new evidence obtained after 1994 consisted of [Bihouet] coming forward in 1996 on her own and identifying [Wessels] and Shammam." Wessels further contends the prosecution used the delay to its tactical advantage in two ways. First, if the People had filed charges in 1996, they would have had to give Bihouet

a plea bargain or immunity in exchange for her testimony because she was subject to criminal liability, at least as an accomplice, for helping to dispose of Binno's jewelry. However, by delaying filing charges until the statute of limitation had run on any charge Bihouet would have faced, the People avoided exposing Bihouet to impeachment on the basis of favorable treatment from the prosecution. Second, the prosecution took advantage of the delay and insisted on excluding Smith's exculpatory testimony as a past recollection recorded based on strict compliance with Evidence Code section 1237.

"Against defendant's weak showing of prejudice, the prosecution's justification for the delay was strong. The delay was 'investigative delay, nothing else.' [Citation.] Here, as in *Nelson*, although 'the police may have had some basis to suspect defendant of the crime shortly after it was committed . . . law enforcement did not fully solve the case" (*Cowan*, *supra*, 50 Cal.4th at p. 434) until 2008, when Abdala disputed Shammam's alibi. As the detectives testified, the case was reviewed periodically, witnesses were re-interviewed, and the evidence reevaluated.

The California Supreme Court said in *Nelson*, "A court should not second-guess the prosecution's decision regarding whether sufficient evidence exists to warrant bringing charges. 'The due process clause does not permit courts to abort criminal prosecutions simply because they disagree with the prosecutor's decision as to when to seek an indictment . . . . Prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt.' " (*Nelson*, *supra*, 43 Cal.4th at p. 1256.) Indeed, " '[a] prosecutor abides by elementary standards of fair play and decency by refusing to seek indictments until he or she is completely satisfied the defendant should be prosecuted and the office of the prosecutor will be able to promptly establish guilt beyond a reasonable doubt.' " (*Nelson*, *supra*, 43 Cal.4th at p. 1256.)

We conclude Wessels's arguments "amount[ ] to the very type of Monday morning quarterbacking that [the California Supreme Court] condemned in *Nelson*." (*Cowan*, *supra*, 50 Cal.4th at p. 436.) Even if the investigation in this case was lacking, we agree with the trial court that no evidence indicated law enforcement or the prosecution deliberately delayed the investigation in order to gain a tactical advantage over Wessels. Balancing Wessels's weak showing of prejudice against the strong justification for the delay, we find no due process violation. Accordingly, the trial court did not abuse its discretion when it denied Wessels's motion to dismiss due to preaccusation delay.

(Lodgment No. 5 at 9-23.)

The Ninth Circuit has explained the analysis a court must conduct when faced with an allegation that pre-indictment delay had violated a petitioner's federal due process rights as follows:

The Fifth Amendment guarantees that defendants will not be denied due process as a result of excessive pre–indictment delay. *United States v. Sherlock*, 962 F.2d 1349, 1353 (9th Cir. 1989). Generally, any delay

between the commission of a crime and an indictment is limited by the statute of limitations. *United States v. Huntley*, 976 F.2d 1287, 1290 (9th Cir. 1992). In some circumstances, however, "the Due Process Clause requires dismissal of an indictment brought within the [statute of] limitations period." *Id.*

. . . .

[¶] In order to succeed on [a] claim that he was denied due process because of pre-indictment delay, [a defendant] must satisfy both prongs of a two-part test. First, he must prove "actual, non-speculative prejudice from the delay." *Huntley*, 976 F.2d at 1290. Second, the length of the delay is weighed against the reasons for the delay, and [a defendant] must show that the delay "offends those 'fundamental conceptions of justice which lie at the base of our civil and political institutions.'" *Sherlock*, 962 F.2d at 1353-54 (quoting *United States v. Lovasco*, 431 U.S. 783, 790, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977)). The second prong applies only if [a defendant] has demonstrated actual prejudice. *Barken*, 412 F.3d at 1136. We have held that establishing prejudice is a "heavy burden" that is rarely met. *Huntley*, 976 F.2d at 1290. "Generalized assertions of the loss of memory, witnesses, or evidence are insufficient to establish actual prejudice." *United States v. Manning*, 56 F.3d 1188, 1194 (9th Cir. 1995). Consequently, [a defendant] must show both that lost testimony, witnesses, or evidence "meaningfully has impaired his ability to defend himself," and "[t]he proof must demonstrate by definite and non-speculative evidence how the loss of a witness or evidence is prejudicial to [his] case." *Huntley*, 976 F.2d at 1290.

*United States v. Corona-Verbera*, 509 F.3d 1105, 1112 (9th Cir. 2007).

Wessels's claim of prejudice is based on the following: (1) the loss of James Smith's testimony about hearing a voice he thought was Binno's between 7:15 and 7:30 p.m. the night of the murder; (2) the loss of any information about a meeting between Monica Bihouet and Detective Rowe in 1996 during which Bihouet allegedly made statements inconsistent with her original 1996 statement or recanted her original statement entirely; (3) the loss of evidence showing third party culpability; and (4) the inability to effectively cross examine Detective Rowe, Kara Walter, Haitham Marcos, and Brenda Konja. (*See* Lodgment No. 7 at 9-21.)[3] Respondent contends Wessels has not established prejudice as to any of these lost witnesses or evidence, and, in any event, there were legitimate reasons for the delay. (Mem. of P. & A. Supp. Answer at 20-32, ECF No. 9.)

---

[3] The Court and Respondent assume Petitioner seeks to assert the same claims he exhausted in the Petition for Review he filed in the California Supreme Court.

Wessels claims he was prejudiced by the loss of Smith's testimony because it called into question the prosecution's timeline as to when Binno was murdered. (Pet. at 18-25, ECF No. 1, Traverse at 2-3.) As the state court noted, however, Smith's observations were speculative. Smith lived in the same apartment complex as Binno, but not next door or below Binno's apartment. Smith was not certain it was Binno he heard arguing with a woman at 7:15-7:30, but stated only that he "heard a male and female yelling from the area of building 3107 [Binno's apartment building]" at that time, and that he "thought the male half of the couple arguing was the male who drives the Volkswagen Rabbit and frequently slaps his girlfriend." (Lodgment No. 1, vol. 5 at 1106 [investigative report, statement of James Smith].) Evidence showed Binno drove a Volkswagen Rabbit.

But Smith's speculative statement is weak in comparison to the testimony of Kara Walter, who lived in the apartment directly below Binno. Walter testified that at about 4:15-4:30 p.m., she heard several people talking as they climbed the stairs above her apartment, where Binno lived. Shortly thereafter, she heard the music turned up very loud, heard two "pops," then voices talking afterwards. (Lodgment No. 9, vol. 6 at 621-22.) Walter's statement is consistent with the evidence found at the scene of Binno's murder and with Bihouet's statement about how Shammam told her he and Wessels committed the murder. Considering how consistent Walter's testimony was with the physical evidence, it is not likely the jury would have credited Smith's statement over Walter's statement. In any event, Smith's testimony would have, at most, simply pushed the time of Binno's murder ahead to after 7:15 p.m. Wessels has not provided any compelling evidence, however, establishing he could not have participated in Binno's murder if it was committed after 7:15 p.m. instead of between 4:15p.m. and 4:30 p.m.

Next, Wessels claims he was prejudiced by the loss of evidence of a meeting between Bihouet and police in October of 1996. (Pet. at 18-25, ECF No. 1.) Wessels claims that at this alleged meeting, Bihouet either made inconsistent statements about

how and when Shammam told her he and Wessels murdered Binno, or recanted her

story entirely.  As support for this claim, Wessels points to a note written by Detective

Rowe dated October 10, 1996, which states, in pertinent part:

> In our office with [Assistant District Attorney] Gordon Davis[, District Attorney Investigator] Rick Martin[, Detectives] Jopes and Rowe.
>
> Wants to meet her at school.  Does not want to talk on the phone.
>
> They called her outside Yvette's house.  Allan and Franswa.  Asked her to go outside.
>
> Did not tell about incident then.  Just asked to hold something for him.  Told the next day about the incident.
>
> A couple of days later said him and Allan did that.
>
> When first told about the murder, was in the truck by themselves.  He was nervous and sweet.
>
> 11.45 attempt about one year ago.[4]  At her apartment.  Turned gas on stove and closed all windows.  Just fed up with everything.

(Lodgment No. 1, vol. 4 at 0864-65.)

Binno's sister, Tanya Binno-Taylor, Bihouet, Martin, Jopes, Rowe and Davis

testified at an evidentiary hearing to determine whether a meeting between Bihouet and

detectives actually took place.  At the hearing, Binno-Taylor testified that at some point

after Bihouet told police about Shammam's and Wessels's involvement in Binno's

murder, she learned from Rowe that Shammam's family had threatened Bihouet and

her family, and that as a result Bihouet told police she had "made up" the story about

Shammam and Wessels being involved in the murder.  (Lodgment No. 1, vol. 3 at

0616-19.)  Monica did not remember an October meeting in 1996 and denied retracting

her statement about the murder, although she did confirm that Franswa threatened her

family.  (*Id.* at 0665, 0669.)  District Attorney Investigator Martin testified he did not

remember any meeting at the sheriff's office with Bihouet, Davis, Jopes, and Rowe,

and, when shown a videotape of Bihouet's statement, he did not recognize her.  (*Id.* at

0683.)  Detective Jopes testified he did not remember meeting in the sheriff's office on

---

[4]  According to Rowe, 1145 is a police code for suicide.  (Lodgment No. 1, vol. 3 at 0715.)

October 10 with Bihouet, Martin, Rowe and Davis. (*Id.* at 0694-95.)   Jopes also testified that it was custom and practice to record any interview detectives had with a witness in a homicide case, either with a tape recording or with notes. (*Id.* at 696-97.) Since no such recording existed, he did not believe a meeting had occurred. (*Id.*) Detective Rowe testified he thought his notes indicated he had a meeting with Davis, Jopes and Martin on October 10, 1996. (*Id.* at 713.) He testified he "[could not] say with certainty that I never heard her tell me she made the story up," but that he was "certain that's something significant enough I wouldn't have forgotten" and that he "would have documented it on a piece of paper." (*Id.* at 0711-12.)   As to the information in his notes, he could not think of any other source for the information except Bihouet. (*Id.* at 0716-18.)  Davis testified he had no memory of any meeting with Jopes, Rowe, Davis and Bihouet in October of 1996. (*Id.* at 0732-34.)

Assuming Bihouet met with law enforcement officials on October 10, 1996, Wessels has not presented sufficient credible evidence that Bihouet recanted her statement about Shammam's and Wessels's involvement in Binno's murder.  The only evidence that Bihouet recanted is Taylor-Binno's testimony at the evidentiary hearing that that she "remembered something" about being told by Rowe that Bihouet retracted her statement after being threatened by Shammam and his family. (*Id.* at 617-20.) Neither Rowe nor Bihouet recalled any such recantation, and there is no written evidence of Bihouet's recantation.

Moreover, even if Bihouet did meet with law enforcement officials on October 10, 1996, and state that Shammam did not tell her about his involvement in the murder until the following day when they were alone in the truck, this information does not go to the heart of Bihouet's testimony — that Shammam told her he and Wessels arrived at Binno's apartment around 4:00 p.m., turned up the music very loud to cover the sound of the gunshots, wrestled with Binno until Wessels held Binno down while Shammam shot him in the head, took Binno's gold jewelry, and later melted down the jewelry and pawned it.  On that question, Bihouet was remarkably consistent over her

two interviews and trial testimony.  (*Compare* Lodgment No. 1, vol. 3 at 0744-819 [Bihouet's April 19, 2000 statement] *with* vol. 5 at 1199-1237 [Bihouet's August 27, 1996 statement] with Lodgment No. 9, vol. 6 at 518-599 [Bihouet's trial testimony].) While the case against Shammam and Wessels rested almost entirely on Bihouet's statements, and thus evidence of inconsistencies would haven been important to the defense, it is unlikely the jury would have given much weight to these small inconsistencies when evaluating Bihouet's credibility.  Walter's testimony about hearing voices between 4:15 and 4:30 p.m., loud music, and two pops is consistent with how Bihouet told police Shammam and Wessels committed the murder.  This consistency is far more important to the jury's evaluation of Bihouet's credibility.

Next, Wessels contends the delay in prosecution prejudiced him because he was unable to present evidence of third party liability.  Over the course of the investigation into Binno's death, Binno's family spoke frequently with law enforcement officials about possible leads.  Suzanne Binno told Rowe she heard a person named Sal Akser "had something to do with David's murder."  (Lodgment No. 1, vol. 4 at 0822.)  She also told Rowe a friend had told her the Mexican Mafia "hit" Binno, information Suzanne told Rowe she got from a friend she refused to name.  Tonya Binno told Rowe a woman named Ophelia knew about Binno's murder; Opheila would also not speak to police.  (*Id.* at 0842, 0848.)  Diana Binno told Rowe Binno had gone to Las Vegas with two Mexicans before the murder.  (*Id.* at 0848.)

In order for evidence of third party liability to be admitted in California, the evidence must meet certain criteria:

> Evidence that raises a reasonable doubt as to a defendant's guilt, including evidence tending to show that another person committed the crime, is relevant.  But evidence that another person had a motive or opportunity to commit the crime, without more, is irrelevant because it does not raise a reasonable doubt about a defendant's guilt; to be relevant, the evidence must link this third person to the actual commission of the crime.  [Citation.]  Evidence that is relevant still may be excluded if it creates a substantial danger of prejudicing, confusing, or misleading the

/ / /

1    jury, or would consume an undue amount of time.   (See Evid.Code, §
2    352.)

3    *People v. Linton*, 56 Cal. 4th 1146, 1202 (2013) (internal citations and quotation marks
4    omitted).

5         Wessels has presented no evidence supporting a conclusion that a viable third
6    party liability defense could have been pursued absent the delay in prosecution.  As
7    Respondent notes, the prosecution provided evidence that Asker was in custody at the
8    time of the murder.  (Lodgment No. 1, vol. 6 at 1284-86.)  The information given to
9    police by the Binno family about Ophelia, Mexican Mafia members, and unnamed
10   "Mexicans," amounted to nothing more than rumors and innuendo. Wessels has not
11   shown how any of this information could have been developed into evidence sufficient
12   to raise a reasonable doubt as to Wessels's guilt.  *See Linton*, 56 Cal. 4th at 1202.  As
13   such, it is simply speculation that the delay caused the loss of a viable defense; absent
14   "definite and non-speculative evidence how the loss of a witness or evidence is
15   prejudicial to [his] case," Wessels cannot prevail.  *See Corona-Verbera*, 509 F.3d at
16   1112.

17        Lastly, Wessels argues the pre-complaint delay made it impossible to effectively
18   cross-examine prosecution witnesses because most could not remember details about
19   the day in question.  As noted above, however, "[g]eneralized assertions of the loss of
20   memory, witnesses, or evidence are insufficient to establish actual prejudice."  *Id.*  In
21   addition, in this case, much of the effects of time were mitigated by the existence of
22   copious notes by law enforcement personnel and recorded statements by witnesses
23   which counsel could use in cross examination.

24        For all the foregoing reasons, the Court concludes the state court's analysis of
25   Wessels's pre-complaint delay claim was neither contrary to, nor an unreasonable
26   application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.
27   Wessels's  has failed to establish "actual, non-speculative prejudice from the delay,"
28   / / /

or that the delay "meaningfully . . . impaired his ability to defend himself." *Corona-Verbera*, 509 F.3d at 1112.

Because the Court has found Wessels has not demonstrated he suffered actual, non-speculative prejudice from the pre-complaint delay, the Court need not proceed to analyze the reasons for the delay. *Id.* But even if Wessels had established sufficient prejudice to proceed to the second prong of this analysis, the delay did not "offend[ ] those 'fundamental conceptions of justice which lie at the base of our civil and political institutions.'" *Id.* The Supreme Court has discussed the analysis which should be employed in balancing any prejudice suffered by a defendant with the reasons for delay as follows:

> The Court of Appeals found that the sole reason for the delay here was "a hope on the part of the Government that others might be discovered who may have participated in the theft . . . ." 532 F.2d at 61. It concluded that this hope did not justify the delay, and therefore affirmed the dismissal of the indictment. But the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. Judges are not free, in defining "due process," to impose on law enforcement officials our "personal and private notions" of fairness and to "disregard the limits that bind judges in their judicial function." *Rochin v. California*, 342 U.S. 165, 170, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). Our task is more circumscribed. We are to determine only whether the action complained of here, compelling respondent to stand trial after the Government delayed indictment to investigate further violates those "fundamental conceptions of justice which lie at the base of our civil and political institutions," *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935), and which define "the community's sense of fair play and decency," *Rochin v. California*, supra, 342 U.S., at 173, 72 S.Ct. at 210. *See also Ham v. South Carolina*, 409 U.S. 524, 526, 93 S.Ct. 848, 850, 35 L.Ed.2d 46 (1973); *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941); *Hebert v. Louisiana*, 272 U.S. 312, 316, 47 S.Ct. 103, 104, 71 L.Ed. 270 (1926); *Hurtado v. California*, 110 U.S. 516, 535, 4 S.Ct. 111, 120, 28 L.Ed. 232 (1884).

*United Statess v. Lovasco*, 431 U.S. 783, 790 (1977).

In Wessels's case, the state trial court exhaustively examined the reasons for the prosecutorial delay in a lengthy, multi-day hearing. (*See* Lodgment No. 10, vols. 1-3.) At that hearing, it was determined that between 1994, when the murder occurred, and 2008, when the case was filed, four detectives worked on the case. (*Id.*) Detective Rowe was the first law enforcement officer investigating the case, and he believed

early on that Shammam and Wessels were the perpetrators. (Lodgment No. 10, vol. 2 at 169.) He took a statement from Wessels in which Wessels was evasive. (*Id.* at 169-70; Lodgment No. 1, vol. 1 at 0110-27.) Rowe continued to investigate the case through crime lab analysis and witnesses statements, but was unable to come up with concrete evidence linking Shammam or Wessels to the crime until 1996 when Bihouet came forward with her information about Shammam and Wessels. (Lodgment No. 10, vol. 2 at 170-72.) Rowe continued his investigation in an attempt to bolster the case and corroborate Bihouet's statement using improved scientific testing and further witness interviews. (*Id.* at 173-74.) In 1997, Rowe was promoted and the case was assigned to Detective Seritella. (*Id.* at 174.)

Seritella began re-investigating the case in 1998, starting with an attempt to locate Bihouet. (*Id.* at 265.) Bihouet, however, could not be located until 2000, when she was re-interviewed.[5] (*Id.* at 265-66.) Seritella also went over the case file numerous times in an attempt to discover some new clue or piece of information that would substantiate Bihouet's statement. He kept the file on his desk and reviewed it from time to time until 2005. (*Id.* at 266-67.) In 2004, he discussed the case with Deputy District Attorney Glenn McAllister. (*Id.* at 267.) Seritella was of the opinion the case was not strong enough to ask that it be formally issued, and McAllister confirmed this during a lunch they had in 2004. Both thought that further evidence needed to be found to substantiate Bihouet's statements. (*Id.* at 267-68.)

In 2005, Curt Goldberg took over investigation of the Binno murder. (*Id.* at 305.) Because the victim and Shammam were Chaldean, Goldberg spoke to a then deputy district attorney, Polly Shamoon, who also was Chaldean, in an attempt to gain insight into the Chaldean community and secure new leads. (*Id.* at 307-08.) He began trying to locate a crime reconstruction expert in order to corroborate Bihouet's version of how the murder was committed. (*Id*.) He also spoke to witnesses again, re-analyzed fingerprints found at the scene, and asked for DNA testing to be done on a hair found

---

[5] Bihouet was in Mexico during that time. (Lodgment No. 10, vol. 2 at 174.)

1   at the scene as well as a DNA profile of Shammam and Wessels.  (*Id.* at 308-09.)

2   Goldberg worked on the case from 2005 until he was transferred in 2007.  (*Id.* at 309.)

3        Finally, Detective Rick Scully took the case over in 2007.  (*Id.* at 332-33.)  He

4   reviewed the case, read the witnesses interviews and police reports, reviewed the

5   forensic evidence and thought about ways to advance the investigation.  (*Id.* at 333.)

6   He re-interviewed several witnesses, included David Abdala.  When Scully told Abdala

7   that Shammam, and possibly Wessels, had told police they were with Abdala the night

8   of the murder, Abdala eventually told Scully that was not true and that Shammam and

9   Wessels were lying.  (*Id.* at 335-36; Lodgment No. 1, vol. 5 at 1187-88.)  Scully then

10  noticed there were slight differences in the stories Shammam and Wessels told about

11  their whereabouts during the time frame the murder was believed to have occurred.

12  (Lodgment No. 10, vol. 2 at 336.)  Based on this information, Scully prepared a power

13  point presentation for the District Attorney's Office, hoping to convince them to issue

14  the case.  (*Id.* at 334-36.)  A warrant for the arrest of Shammam and Wessels was issued

15  about two months later.  (*Id.* at 336.)

16       Citing *People v. Catlin*, 26 Cal. 4th 81, 107, 109 (2001), the state court wrote

17  that "[a] claim based upon the federal Constitution . . . requires a showing that the delay

18  was undertaken to gain a tactical advantage over the defendant." (Lodgment No. 5 at

19  14.)  *Catlin* cites *Lovasco* for this proposition, which states:

20      In our view, investigative delay is fundamentally unlike delay undertaken
    by the Government solely "to gain tactical advantage over the accused,"
21      *United States v. Marion*, 404 U.S., at 324, 92 S.Ct., at 465, precisely
    because investigative delay is not so one-sided.  Rather than deviating
22      from elementary standards of "fair play and decency," a prosecutor abides
    by them if he refuses to seek indictments until he is completely satisfied
23      that he should prosecute and will be able promptly to establish guilt
    beyond a reasonable doubt.  Penalizing prosecutors who defer action for
24      these reasons would subordinate the goal of "orderly expedition" to that
    of "mere speed," *Smith v. United States*, 360 U.S. 1, 10, 79 S.Ct. 991, 997,
25      3 L.Ed.2d 1041 (1959).  This the Due Process Clause does not require.
    We therefore hold that to prosecute a defendant following investigative
26      delay does not deprive him of due process, even if his defense might have
    been somewhat prejudiced by the lapse of time.

27

28  *Lovasco*, 431 U.S. at 795.

In *United States v. Moran*, 759 F.2d 777, 781 (9th Cir. 1985), the Ninth Circuit found that there is no such requirement.  But, the question before this Court is whether the state court unreasonably applied clearly established Supreme Court law, not Ninth Circuit law.  And the state court's interpretation of *Lovasco* is not "unreasonable," since *Lovasco* does imply that while investigative delay does not violate the Due Process Clause, delay undertaken for the purpose of tactical advantage could.  *Lovasco*, 431 U.S. at 795.  In any event, the state court's conclusion that the delay did not violate Wessels's due process rights under California law renders any error in the application of United States Supreme Court law harmless.  Under California law, as the state appellate court noted, "negligent as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process." (Lodgment No. 5 at 15.)  The state court found that Wessels did not establish the prosecution delayed filing charges either negligently *or* to obtain a tactical advantage over him.  (*Id.* at 23.)

And, this conclusion is amply supported by the record.  Each law enforcement officer who was assigned the case over the years attempted to push the investigation forward by re-interviewing witnesses and re-examining the case file for new lead and evidence.  It was not until detectives secured a crime scene reconstructionist, persuaded Abdala to dispute Shammam and Wessels's account of their whereabouts the night of the murder, and became certain that no other evidence would emerge over time that the investigation was far enough along to persuade prosecutors to issue arrest warrants.  Given the weak showing of prejudice made by Wessels, the investigative delay was sufficiently justified.  *Lovasco*, 431 U.S. at 790.

For all the foregoing reasons, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.  Wessels is not entitled to relief as to this claim.

### C. *Exclusion of Evidence (Claims One and Three)*

In claims one and three, Wessels contends the trial court erroneously excluded evidence, depriving him of his federal constitutional right to present a defense.  (Pet.

at 6-17, 26-35, ECF No. 1; Traverse at 5-8, ECF No. 11.)  Wessels specifically objects to the trial court's refusal to permit him to introduce prior statements by James Smith, who by the time of trial could not remember anything about the evening in question or what he told police in 1994.  (Pet. at 6-17, ECF No. 1; Traverse at 5, ECF No. 11.) Wessels also objects to the trial court's exclusion of evidence that Bihouet told police in 1994 that Shammam was a drug dealer who sold "suitcases full of cocaine and pounds of methamphetamine."  (Pet. at 26-35, ECF No. 1; Traverse at 6-8, ECF No. 11.)  Defense counsel wanted to question Bihouet about these allegations because, he contended, they were so outrageous as to reflect negatively on Bihouet's credibility. (*Id.*)

As Respondent correctly argues, to the extent Wessels is arguing that the state court improperly excluded this information under state law, he is not entitled to relief. Federal habeas relief is not available for alleged violations of state law.  *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Clearly established federal law holds that the right to present [evidence and] witnesses is essential to due process and is guaranteed by the compulsory process clause of the Sixth Amendment.  *Taylor v. Illinois*, 484 U.S. 400, 409 (1988); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *Washington v. Texas*, 388 U.S. 14, 19 (1967); *Denham v. Deeds*, 954 F.2d 1501, 1503 (9th Cir. 1992).  The Ninth Circuit has noted, however, that "[t]he defendant's right to present evidence . . . is not absolute. *Perry v. Rushen*, 713 F.2d 1447, 1450 (9th Cir. 1983); *see also Tinsley v. Borg*, 895 F.2d 520 (9th Cir. 1990).  Thus, the exclusion of defense evidence is error only if it renders the state proceeding so fundamentally unfair as to violate due process.  *Estelle*, 502 U.S. at 67.

The Ninth Circuit has identified five factors that should be considered when deciding whether a court's exclusion of defense evidence violates the constitution: "(1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole

evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the defense." *Tinsley*, 895 F.2d at 530; *see also Duhaime v. Ducharme*, 200 F.3d 597, 600 (2000) (finding that "[Ninth Circuit] cases may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law. . . .")  The importance of the evidence must then be balanced against the state's interest in exclusion.  *Tinsley*, 895 F.2d at 530.  To overcome the state's strong interest in the administration of its trials, the circumstances of the exclusion must be "unusually compelling."  *Perry*, 713 F.2d at 1452.

### 1. *James Smith's Statement to Police (Claim One)*

In claim one, Wessels complains that the trial judge improperly prevented him from presenting evidence of Smith's statement to police that he heard a man and a woman arguing in the vicinity of Binno's apartment between 7:15 p.m. and 7:30 p.m. the night of the murder, and that he thought the man was Binno.  This information, Wessels argues, would have cast doubt on other witness statements and thus the estimate of when the murder occurred.  In turn, Wessels claims this would have eliminated him as a suspect, or, at minimum, cast doubt on the testimony of Walter and others which pinpointed the murder occurring between 4:15 p.m. and 4:30 p.m.  (Pet. at 6-17, ECF No. 1; Travers at 5, ECF No. 11.)  In addition to arguing the claim does not present a federal question, Respondent notes Wessels did not present the proper foundation under state law to permit the introduction of Smith's statement, Smith's statement would not have been inadmissible under state law anyway because he could not remember anything about what he had said, and Wessels was not prejudiced by the refusal of the state trial judge to permit the introduction of Smith's statement because it was speculative.  (Mem. of P. & A. Supp. Answer at 36-40.)

The state court addressed this claim only on state law grounds.  Thus, this Court must conduct an independent review of the record to determine whether the denial of the claim was contrary to, or an unreasonable application of, clearly established Supreme Court law.  *Himes*, 336 F.3d at 853.

Considering the first *Tinsley* factor, the probative value of the excluded evidence on the central issue was weak. As pointed out by Respondent, Smith's statement was speculative with regard to whether it was Binno he heard between 7:15 and 7:30 p.m. He only stated that he "heard a male and female yelling from the area of building 3107 Sweetwater Springs," and that "he thought the male half of the couple arguing was the male who drives the Volkswagen Rabbit." (Lodgment No. 1, vol. 5 at 1106.) Although there was evidence Binno drove a Volkswagen Rabbit, it is not known whether he was the only person Smith knew to drive a Volkswagen Rabbit. And, even if Smith's statement had been admitted, there is no reliable evidence in the record showing Wessels's could not have been at Binno's apartment between 7:15 and 7:30 p.m. committing the murder.

The second and third *Tinsley* factors, reliability and whether the evidence is capable of evaluation by the trier of fact, weighs in favor of admissibility. There is nothing in the record showing Smith was an unreliable witness and his statement could be evaluated in the same manner as other witness statements. The fourth *Tinsley* factor also weighs in favor of admissibility, as it was the sole evidence that Binno was alive between 7:15 and 7:30 p.m. Finally, the fifth factor also weighs somewhat in favor of the admissibility. Although Wessels presented no hard evidence that if Binno was killed between 7:15 and 7:30 p.m. he could not have committed the murder because he had an alibi, the time of Binno's death was a part of the defense. But the defense mainly focused on the crime scene reconstruction put forth by the prosecution, which posited that Binno was held down by one person while the other person shot him in the head. The defense brought its own crime scene reconstructionist to testify that the body was moved after death and that Binno was likely shot execution style while he was his knees.

The Court must also balance the importance of Smith's testimony against the state's interest in exclusion. *Tinsley*, 895 F.2d at 530. The Supreme Court has recognized the strong state interest in preserving a state's evidentiary rules, noting that

"state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," and that "[s]uch rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (citations and quotations omitted). The exclusion of defense evidence is "unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." *Id.* (citations omitted).

The Ninth Circuit discussed two of the leading United States Supreme Court cases, *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) and *Washington v. Texas*, 388 U.S. 14, 19 (1967), which illustrate when the exclusion of defense evidence reaches constitutional dimension, in *Perry v. Rushen*, 713 F.2d 1447 (9th Cir. 1983). In *Chambers*, the trial court excluded evidence that another person had confessed to the crime on the ground that it was hearsay. The Supreme Court, however, found that the state's interest in excluding the evidence was too weak to pass due process scrutiny. The evidence was not unreliable, unlike most hearsay statements, because it was a declaration against the declarant's penal interest. Further, it was critical to the defendant's case because it was the only source of the exculpatory information. Thus, the exclusion of the evidence violated Chambers' due process rights. *Perry*, 713 F.2d at 1452 (citing *Chambers*, 410 U.S. at 302.)

In *Washington*, Washington tried to call a codefendant, Fuller, who had already been convicted, to testify that Washington had left the murder scene before the fatal shot was fired. The trial court excluded the testimony because a local rule prevented accomplices from testifying in behalf of each other. *Id*. at 1452 (citing *Washington*, 388 U.S. at 21.) The Supreme Court found that, on balance, the exclusion violated Washington's due process rights. *Id.* (citing *Washington*, 388 U.S. at 21.) The procedural rule excluded an entire class of witnesses because they were ostensibly more likely to lie. The prosecution, however, used these same witnesses in their cases in chief. Thus, the Supreme Court found the rule was arbitrary, unfair and did not serve

1   a legitimate state interest.  The defendant's due process rights were therefore violated

2   by the exclusion of the testimony.  *Id.* (citing *Washington*, 388 U.S. at 21.)

3       While Smith's statement suggested Binnon's murder may have happened at a

4   later time than Walter's statement, unlike the defendants in *Chambers* and *Washington*,

5   this evidence did not exonerate Wessels.  As the Ninth Circuit noted in *Perry v.*

6   *Rushen*, 713 F.2d 1447 (9th Cir. 1983):

7           Due process draws a boundary beyond which state rules cannot
        stray; it does not displace the law of evidence with a constitutional
8           balancing test.  State rules are designed not to frustrate justice, but to
        promote it.  Our common rules of evidence — testimonial privileges, the
9           hearsay rule — have been justified by long experience. *Chambers*, 410
        U.S. at 298, 93 S.Ct. at 1047; *Washington*, 388 U.S. at 24, 87 S.Ct. at
10          1926 (Harlan, J., concurring). The state interests which they embody have
        already been weighed and found to be compelling; only the most urgent
11          considerations, such as those in Chambers, can outweigh them.   A
        defendant must show that his interest clearly outweighs the state's before
12          we will interfere with routine procedural matters.  *Accord Britton v.*
        *Rogers*, 631 F.2d 572, 580 (8th Cir.1980), cert. denied, 451 U.S. 939, 101
13          S.Ct. 2021, 68 L.Ed.2d 327 (1981). Thus, a separate consideration of due
        process will rarely be needed in day-to-day application of the rules of
14          evidence.  Particularly crucial and reliable evidence, such as the excluded
        confession of *Chambers*, will serve as a warning flag to trial judges to
15          weigh the fairness of their decision.   Evidence of little importance,
        whether merely cumulative or of little probative value, will almost never
16          outweigh the state interest in efficient judicial process.

17   *Perry*, 713 F.3d at 1453.

18       Here, the exclusion of Smith's statement was simply a routine application of

19   state evidentiary laws.   Accordingly, the Court concludes that the state court's

20   exclusion of the testimony did not violate Wessels's due process rights, and the state

21   appellate court's decision upholding the exclusion was thus neither contrary to, nor an

22   unreasonable application of clearly established Supreme Court law. *Williams*, 529 U.S.

23   at 412-13.  Wessels is not entitled to relief as to this claim.

24       2.  *Statements Made by Monica Bihouet (Claim Three)*

25       Wessels also contends the state court erred when it refused to permit him to

26   introduce evidence, via cross-examination of Bihouet, that Bihouet told police

27   Shammam was a drug dealer who dealt "suitcases of cocaine." (Pet. at 27-35, ECF No.

28   1; Traverse at 6-8, ECF No. 11.)  Wessels wanted to use this information to show "the

outrageousness of the allegations" Bihouet was making against Wessels and Shammam, and thereby call her credibility into question. (Lodgment No. 9, vol. 6 at 552-56.) The trial judge concluded the evidence was irrelevant and more prejudicial than probative under California Evidence Code § 352. (*Id.* at 557, 586-87.) The state appellate court agreed, analyzing the claim on state law grounds only. Thus, this Court must conduct an independent review of the record to determine whether the denial of the claim was contrary to, or an unreasonable application of, clearly established Supreme Court law. *Himes*, 336 F.3d at 853.

Considering the *Tinsley* factors, it is clear the exclusion of this evidence did not rise to the level of a due process violation. While a central issue in the case, and a major part of the defense, was Bihouet's credibility, her claim about Shammam dealing "suitcases full of cocaine" was not particularly probative of her credibility, mainly because there was simply no evidence to establish her claim was false or that, even if it was false, her testimony about Shammam's statement to her about his and Wessels's involvement in Binno's murder was therefore false. For these same reasons, the reliability of evidence is weak, and it would have been nearly impossible for the trier of fact to evaluate the evidence in the context of the trial as a whole. Moreover, the claim about Shammam's drug dealing abilities was not the sole evidence on the question of Bihouet's credibility. Defense counsel was able to effectively cross-examine Bihouet about inconsistencies and bias in the absence of the cocaine dealing claim.

In addition, like the exclusion of Smith's statement, the exclusion of the "suitcases of cocaine" statement was a routine application of evidence rules excluding irrelevant evidence and hearsay statements. (Lodgment No. 9, vol. 6 at 586-87.) As noted above, "[s]uch rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve." *Scheffer*, 523 U.S. at 308. The exclusion of defense evidence is "unconstitutionally arbitrary or disproportionate only where it has infringed upon a

weighty interest of the accused." *Id.* (citations omitted).  Here, as with Smith's statement, the exclusion of Bihouet's claim about the volume of Shammam's drug dealing does not rise to the level of a federal due process violation because it is not the kind of "[p]articularly crucial and reliable" evidence contemplated by *Chambers* and *Washington*.  *See Perry*, 713 F.3d at 1453.

For the foregoing reasons, after an independent review of the record, the Court concludes the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Himes*, 336 F.3d at 853.  Wessels is not entitled to relief as to this claim.

## V.    CONCLUSION

For the foregoing reasons, the Petition is **DENIED**.  A certificate of appealability as to claim two concerning the delay in filing charges is **GRANTED**.  It is further **ORDERED** that judgment be entered denying the Petition.

DATED:  October 18, 2013

HON. GONZALO P. CURIEL
United States District Judge